11. Good morning, Your Honor, Christopher Walters on behalf of the appellants. We are here today about a case that involves an unprovoked and unannounced attack on the plaintiff in which a fellow inmate with no prior history or problems with the plaintiff attacked the plaintiff from behind in the wind unit at Rayburn Correctional Center in the yard area with a swing blade yard tool. It's important to note that prior to this incident, for at least the seven years prior to this incident, there were no prior incidents involving yard tools used in an attack on an inmate. And so the questions that you have today are two. One, whether these officers were deliberately indifferent to the plaintiff's constitutional rights, and two, whether the law was clearly established at that time that their actions were unlawful. And I'll start with the officers in this case because we have a failure to protect claim against the officers and then a failure to train claim against the warden himself. With respect to deliberate indifference, the first element is always knowledge or awareness of the risk. In this case, as I mentioned just a moment ago, there were no prior incidents for the seven years prior to this. Furthermore, each of the defendants, both of the officers and the warden, testified that they were not aware of any prior incident involving an inmate being attacked using a yard tool. Furthermore, the plaintiff in this case makes no allegation that he had any prior incidents with this inmate in question that attacked him. In addition, the plaintiff never notified or informed any RCC official or Raven Correctional official that there were any issues between him or that he felt threatened by this inmate. And furthermore, the plaintiff makes no allegation that he feared or felt threatened by the Raven And this is important because at the end of the day, these officials must have knowledge or awareness of the risk, of a substantial risk of serious harm, before they can be held liable. So there's no dispute there was a tool control policy? That's correct. And there's no dispute that a sling blade or a swing blade, I've heard it referred to as both. And growing up, I think I referred to it as swing blade or sling blade. Yes, Your Honor. There's no dispute that that's a dangerous instrument? We would dispute that to the extent that it is not the tool or the implement that is necessarily dangerous. It is the way in which it is used. And those officers... Okay. On AK-47, we can have a debate and argue about whether or not it's a dangerous instrument. It just depends on who's wielding the AK-47. In this case, let's say an inmate is wielding a sling blade. And it depends largely upon the circumstances surrounding the use of the implement, how long it's being allowed to be used. Was it designated as a restricted tool under the tool control policy? It was not designated as a restricted tool under the tool control policy. The district court interpreted the tool control policy to say that dangerous weapons would be considered restrictive tools. However, both of the officers... Do you have an example of what was designated as a restricted tool? A restricted tool, I believe a couple of examples would be a hacksaw, power tools, a blade, longer, a knife. They were designated as restricted. Designated as restricted. Even though those, too, depend on who's wielding it. Correct. All right. Correct. And to the extent that a tool is restrictive or non-restrictive, at the end of the day, the question still remains, the underlying question that must be answered is, was there knowledge and awareness of a substantial risk of serious harm that this implement would be used as a weapon under these circumstances? Subjective awareness. Subjective awareness. What classification of offenders are at this center? Because it's called a correctional center, right? Yes, Your Honor. I mean, are these non-violent offenders, substance abusers, I mean, what? It houses all levels, I guess you would consider. Any offense committed where they were committed to the Department of Corrections could be housed at Rayburn Correctional Center. Now, with respect to WIND unit itself, WIND unit, I believe Officer Ladner testified that that was a minimum security area. They're all in dormitories. There is a maximum security area where they're in cell blocks, and that's... It was minimum security. And that determination about whether or not there's going to be minimum or maximum security is made at least in part based on some assessment of the classification of the inmates that are housed there. Is that right? I believe it's... Initially, it's based upon the classification of their offense, although I can't be totally positive about that. But in terms of where they are housed within Rayburn Correctional, in order to be considered a minimum custody, you have to have had good behavior for at least, I think, six months, I think was the testimony that if they receive a disciplinary violation that's serious enough to warrant a lockdown or a higher security status, they would go into Level 1 for 90 days, at least 90 days, and then they would go to Level 2 for 90 days at least before they would be allowed to be back in with a minimum security population such as WIND unit. So there's a certain amount of time that they've had to have shown good behavior, at least within the prison, no rule violations, things like that. So Level 1 is maximum security? Is that what you're saying? Level 1 within administrative segregation, which is what they call the... where they put rule violators, folks that violate the rules, that's where they are transferred to is administrative segregation. Level 1 would be the first level. And then if they do well in that, there's no rule violations and their conduct is sufficient, then they will move to Level 2, which entails a few more privileges and a few less restrictions. But overall, did I hear... did I understand you to say that any inmate guilty of any offense, any felony offense, could be housed at this correctional center? As I understand it, yes. And then they'd be in different levels of security? Yes, Your Honor. Based on other classification, I guess? That's fine. I think it's based largely upon their conduct within the institution in terms of them showing, the offender showing that he can follow the rules, he can abide by the policies and... So a violent offender could be among this over 300 people that got released into the WIN unit at any given point in time? That was convicted for a violent offense? Right. That's correct. All right. That's correct. And that's one of the reasons that we would go back to and really harp on this lack of They do yard call, they do work call every single day, or almost every single day. When the weather is good enough to do it, they will issue tools to certain offenders and then the offender will go out in the yard and they do it. Well, you say certain offenders. Well, what will happen is that as they make a yard call where all of the offenders that would like to go out to the yard will be allowed out into the yard, which is quite a large area, and the officer will either pick several offenders, or if he has offenders that request a work assignment, something like that, he will bring them over to the tool storage locker and he will take that offender's ID, which is what he needs to get anywhere and everywhere if he wants to eat. But anybody who's among that more than 300 who's coming into that WIN unit is eligible for issuance of a sling blade, right? Generally, yes. All right. Yes. And then the tools are only issued for two to three hours at a time in the morning and then in the afternoon. And Officer Pierce testified that all the tools, each specific tool has a specific number on it and the offender has to give his offender ID to the officer. He will then keep that ID, issue the tool, and record exactly which tool, which offender, so that now that there's accountability, if this tool is abandoned or if this tool is used improperly or something happens, the offender that it's issued to will be held responsible for that as well as anyone that actually, any other person that might use that tool inappropriately should they be able to get their hands on it. But in questioning in his testimony, Officer Pierce stated that he had worked on WIN unit for at least one year, I believe, as the key officer who issues these tools, and he had never had an offender leave his tool before. Every single time the offender, he would issue the offender the tool, they would use the tool, and then they would bring it back, he would store it back, they would get their ID back, and there were no issues with that. And so the question ultimately becomes their knowledge or awareness of a substantial risk of serious harm. This court in Dovey-Robertson basically said that in order to know of an excessive risk of harm to an inmate, that risk must show itself in concrete form, meaning just the fact that some tools are dangerous or could be used as weapons does not put an officer or a warden on notice that they will be used or that they are likely to be used as weapons. It only matters if they know that there is a substantial likelihood that it's going to happen. Quick record question. So the blue brief states that at least as far back as 2007, there were no prior assaults by inmates with a yard tool at the prison, correct? That's correct, Your Honor. And then it goes on to say during the previous seven-year period, there had been only four incidents, three with a broom, one with a mop, correct? That's correct. So this was the first and only sling blade attack? The four incidents that we referenced there, it's in that same seven-year time period because that's all the... Same seven-year time period. That's all the documentation that we have, however, as I noted earlier, all of the officers testified that they could never remember any prior incident like this and Officer Pierce has had 11 years as a corrections officer at that point, at the point of this incident. Officer Ladner had 20 years at this point and Warden Tanner had 33 years with the Department of Corrections at the time of this incident. So like I said, we only have records going back to seven years that we could prove that there were no prior incidences. But that record reveals one mop incident, three brooms. That's correct. There's no yard tools whatsoever. And we thought it important to point out any other tool-like object that may have been Over a thousand offenders within Rayburn Correctional Center, there were four prior incidences and all of them involved cleaning utensils such as a broom or a mop or something like that. And so, with respect to your question, Judge Graves, about the dangerousness, we think it's about the circumstances that are involved and as this court said in Valvey, the city of Houston, it's common sense that procedures carried out on a regular or daily basis without any showing of prior violations gives rise to a strong inference that such violations are not so obvious or so likely to result in a violation. Let me ask you a question about the policy because, I mean, the appellee obviously makes much of the policy. Did the policy require direct supervision of those inmates who had the sling blades? Not of the swing blade directly. Of restricted tools, the policy said yes, direct supervision. And there is agreement that direct supervision means eyes on that person at all times. That would be correct. And in terms of supervision, I'm glad you brought that up because part of the issue or part of the argument on the other side is that these tools are just handed out randomly, that there's no control over them, and that there's no supervision. However, we showed in our brief in the record evidence that there are at least four officers at all times on WEND unit as well as security cameras on the backside of WEND unit yard that can monitor that side as well as multiple officers on the other side that can and have issued disciplinary reports and write-ups to offenders who made bad choices or violated some rule of the prison on the WEND yard. And they observe that from their position where they were within the prison because all of these areas are only separated by a chain link fence. And all of the officers are taught monitoring, supervision, being observant, that you're assigned, you're responsible for that, but you're responsible for everything. And both of the officers in this case, Pierce and Ladner, both testified that they were aware that the officer working the security cameras has written up multiple offenders for things they've done on WEND yard and other places. And I think it's reasonable for them to at least have assumed that there was, if not someone there, that there would have been someone there keeping an eye or that would have had an eye to that area at that time. We don't know that there was and we don't have any evidence to show that there was, but we think it's reasonable for them to have assumed that considering all of the record evidence. And I'm out of time. But just one more question. Yes, Your Honor. There's no dispute though that no officer actually saw, the story is that the blade was left there by the inmate to whom it was issued, so there's no dispute that no officer actually saw that blade lying there unattended. There is no dispute on that, Your Honor. And no officer saw anybody hit another inmate with a sling blade? There's no evidence in the record of that. All right. All right. Thank you, Mr. Walters. You've saved time for rebuttal. Ms. Mills? Good morning, Your Honors. Thank you. Allison Mills on behalf of Clarence Joseph Jason. I'd like to zoom out and address three big issues in the following order. First, the constitutional right in question. Second, the facts in dispute. And finally, third, the questions of law for which this court has jurisdiction to issue a decision. The constitutional right in question first is the Eighth Amendment right to reasonably safe conditions of confinement. That's well established. We often say Farmer v. Brennan is the seminal case. It is not the right to enforce the tool control policy. And I want to speak to that just a minute because the defendants rely heavily on Doe v. Robertson. In that case, this court said that the violation of the policy there did not give rise to the violation of a constitutional right. Defendants rely on that to say the violation of the tool control policy can never in and of itself justify liability here. Doe is a very different case. The facts are very different. The policy in that case required that when someone transports female detainees, if the driver is male, he needs to bring along a female companion. The intent of that policy was to minimize allegations of sexual assault. But just because there's a male driver driving a bunch of females, you don't automatically assume or at least to use the court's language, it's not highly predictable that there will be a sexual assault. Here by contrast, we're in a prison, we're on a prison yard. It is highly predictable that if you issue a sling blade to a violent offender, he'll use it as a weapon. Why is that highly predictable? I don't understand that at all. Well, it's highly predictable because prisons, unlike the streets of America, are known to be very violent places. What about brooms and mops? I mean, according to the record, in this case, as far as we know, there were incidents with brooms and mops, but no previous incidents with a sling blade. Actually, I'd love to address why there might not have been any previous incidents. And it's because until four years ago, inmates who were issued sling blades to work, worked in the fields, and they were supervised by gun guards. RCC used to have 60 gun guards to supervise inmates carrying sling blades. They don't have the budget for that anymore. They only have three. When did that change? Four years ago. If it's in the record. Four years ago. Officer Pierce testified. All right. So then for four years, there were no incidents with sling blades. Is that right? Well, this incident was in August 2015, so that is four years ago from today. I believe the testimony that they ceased using gun guards four years ago was probably this time last year, so we're in the same period. So is it highly predictable that inmates would use brooms and mops as weapons? Well, brooms and mops are one thing, a sling blade, which is a blade. No, answer my question, because you said it's highly predictable as to the sling blade, but we know that there were incidents with brooms and mops being used. There are, of course, public incidents. I'm not saying it's in the record here. It probably isn't of brooms and mops being used for sexual assaults, but in any event, we know common sense tells us that a broom or a mop, if it has a wooden or a metal handle or something metal on the end of it, could be used to injure someone severely. So is it highly predictable that a broom or a mop would be used? I think when you have violent offenders, it's highly predictable that they will use implements such as a broom and a mop handle. Certainly, brooms and mops, they're not yard tools. Yard tools, which include sling blades, are more dangerous. I do think it's highly predictable in the prison environment that a violent offender will use any implement in his hands, especially one that already has a blade on it as a weapon, and that's the testimony in this case. The defendants themselves agreed to that. And in fact, that's why Warden Tanner wrote the tool control policy itself. And the tool control policy itself says, restricted tools are any tools that may be used as weapons, and they give a list of tools. And to your question, Judge Graves, no, a sling blade is not on that list, but the policy says the list is just illustrative. These are just examples. Where will we find in the record evidence that these defendants were subjectively aware of a substantial risk of serious harm, but disregarded that risk? I'll tell you. Warden Tanner testified himself that the risk was obvious. He agreed that it was kind of like a duh risk. That is at 2576. He drafted the tool control policy in part to address that risk. The tool control policy has a section on restricted tools. It says, restricted tools are any tools that can be used as a weapon. It lists examples. It says this list is simply for illustration. If you have a question, ask somebody. The list includes a ditch bank blade. This is at 2569. I think everyone would agree that a sling blade is a restricted tool. What should we do when we issue a restricted tool? I asked Warden Tanner. He said, you've got to directly supervise them. That means eyes on them. They need to be in sight. That's at 2592. Notwithstanding this, notwithstanding the tool control policy he drafted and signed himself, notwithstanding his testimony that, of course, it's essential to directly supervise inmates who are handed sling blades, Officer Pierce, in 15 years of employment at RCC, he received only 15 minutes of training on tools. Now, I don't know if that means inventorying of tools, maintenance of tools, supervision of tools. I don't know. 15 minutes in 15 years. And that was in 2016 after the incident in question. So your complaint is that there was no one standing there near enough to see either that the inmate to whom the tool had been issued abandoned it, or that someone else picked it up and used it as a weapon? Is that your complaint? Yes, sir. Let me describe their practice in a nutshell. And this testimony is 2603 to 06. This is Officer Pierce testifying. This is the practice. Every morning at 7 AM, one officer on the day in question, Officer Pierce, runs 300 inmates out of their dormitory and into the prison yard. He then picks off, quote, just random four or five inmates and gives them sling blades. For the next two or three hours, 300 inmates, four or five of them armed with sling blades, roam the prison yard. This prison yard is gigantic. It has a full-sized football field, a baseball diamond, a basketball court, several other recreational areas. For that two to three hours, only one officer is responsible for making periodic rounds. That's it. Now, they will say, we had lots of other officers who were supervising. That's not true. There were two other officers on the wind unit, but they were dorm officers assigned to the dorm. The other officers to whom they point were assigned to the vo-tech, the laundry, the gym, outside the wind unit. They were assigned to posts inside buildings off the unit. If any of these people had any line of sight, it was through windows, fences, and gates. It was not their job to supervise inmates on this gigantic yard. The reason this happened, the reason on the day in question Bernard Turner abandoned his sling blade, and by the way, he was charged with kidnapping, rape, and battery. The reason no one saw him abandon a sling blade on the ground, and the reason no one saw, actually, he abandoned it on the ground to go inside and watch TV. Nobody saw that. No camera, no person. The reason nobody saw another inmate named Victor, charged with second degree murder, pick up the inmate, stalk my client, and strike him violently in the back of the head, the reason nobody saw that. He was charged with, when you refer to these people, weren't they? His ultimate conviction was habitual homicide, manslaughter. My apologies. The reason nobody saw that is not because they were negligent. This is not a negligence case. The reason nobody saw it is because defendants' practice of issuing sling blades and relying on periodic rounds only made the prison yard unsafe. And it's that practice, I think, Judge Smith, that we complain about. That practice makes the prison yard unsafe. And I return again to the fact that... The practice of, specifically, say it again. The practice of what? Issuing sling blades to four or five inmates in a prison yard and relying on solely periodic rounds to supervise them. That's their practice. Now, they say they faithfully followed the tool control policy. What they mean is they faithfully required that an inmate give them an ID in exchange for a sling blade. That's it. That's it. And the question is, is it objectively reasonable? Is it objectively reasonable? Why are you laughing? I mean, there's nothing funny about this. I'm not... I'm about to cry. I'm not laughing at all. Is it objectively reasonable for defendants to issue sling blades and not supervise them? Is that objectively reasonable as a matter of law? I don't think this court wants to hold that. Because to say that is to say that we can arm inmates and let nature run its course. So what would be the constitutional minimum assuming that there's been a decision made to issue a broom or a mop or a sling blade or a screwdriver or any other thing that possibly could be used to injure another inmate or a guard? What would be a constitutional practice? What would be the constitutional minimum that if you were advising the prison... I'm not talking about best practices. I'm talking about a constitutional minimum for how much supervision there should be if a broom or a mop or a sling blade is to be issued and used on the prison property for some sort of maintenance or repair. I would distinguish between the broom and the sling blade. Because I think a broom and a mop, certainly the wooden stick is an implement that can be used as a weapon. But a sling blade has a blade on it. So I think that's different. And a sling blade is used in the yard. But there were more incidents with brooms and mops than with sling blades. I don't know... I realize the broom and mop thing is embarrassing for you because it's hard for you to handle because a broom or a mop is such a common thing. But the history shows that the brooms and the mops were a bigger problem than sling blades. So tell us what the constitutional minimum is for use of brooms and mops and sling blades. Well, I think you have to supervise, eyes on them, supervise violent offenders with implements that can be used as weapons. I don't think this is like the microwave cases, right? It's not obvious that a microwave can be used as a weapon. It's not obvious that a cup of water will be weaponized by boiling it in a microwave and throwing it on an inmate. That's not obvious. It is obvious that a violent offender will use a sling blade as a weapon. And I think when you issue a weapon, you need to supervise it. I'm sorry, I said when you issue a weapon. When you issue a tool such as a sling blade, you need to supervise its use. I think that that is not unreasonable at all. I think that's objectively reasonable. I mean, that begs the question because there was, in fact, supervision. You're talking about the degree of supervision, obviously. And that's the question of fact in this case, actually. And I should get to that. The district court denied defendant's motion for summary judgment because she found there are two genuine disputes of material fact. Okay, but you still haven't answered my question about constitutional minimum. I mean, would you say, for example, I'm just making this up. I'm trying to give you an answer here. Would you say, for example, that the Constitution as a minimum would require that for every person issued a sling blade, that there be a guard within 10 feet with his or her eye constantly on the inmate with a sling blade? Or would it be something less than that or something more than that? Well, I think it would be something more than periodic rounds. I think what we have to define is... I'm just asking you what the Constitution requires. Suppose that you're an attorney and you've been hired by the prison system to draw up a policy that's not going to run afoul of the Constitution. I would enforce the policy that Warden Tanner wrote. That policy requires direct supervision. And he said that means eyes on them supervision. Supervision, line of sight. I would enforce his policy. And I want you to get to your genuine disputed material fact, but you have a failure to train claim? I'm sorry? Is there a failure to train, properly train? Is there a claim for that? Yes, sir. As I understand the policy, I guess I don't know that I would need any training. You're saying they just should have enforced the policy. The training, to me, the training is you read the policy. Policy says if it's a restricted tool, direct supervision. And direct supervision means eyes on them. What would the training be in addition to reading the policy? Well, I think the point is there was no training at all. But so I think that... Well, you're the one who said there should have been some training. So I'm asking you, what would the training have been? Well, I think the training could be if you are out and if you're out in the yard and you've issued these sling blades, you need to stand here and be sure that the inmates who have them are within your line of sight. Or you need to make sure that the inmates who have sling blades are over here in this contained space so that they can be within your line of sight. That's a great thing that they could train on. So that class is over, right? They're not... Listen to what you just said and then we go out there and do it. What's that? We listen to what you just said in our training class and then we go out there and that's what we do every day. Class is over, right? That's why I'm trying to figure out what this whole failure to train claim. But anyway... I'll just say that there's training on all sorts of things. They have training on how to keep keys on a tool belt. Prisons train, according to defendants, RCC trains its officers every single day. Therefore, it's very striking that in 15 years, Officer Pierce had only 15 minutes of training generally on tools. So I think there was a total absence of training. And I think the failure to train here on a tool control policy, to require them to read and understand the tool control policy, to understand that when you issue a sling blade to a violent offender, you must directly supervise its use and that means eyes on them supervision. It's not too much to ask that they reinforce that through some sort of seminar or periodic training session. Back to why the District Court denied defendants' motion for summary judgment. The District Court found there are two genuine disputes of material fact. The first is whether defendants took any adequate measures to abate the risk that inmates' use of sling blades would present substantial bodily harm. Excuse me. The second was that a genuine dispute of material fact as to whether Warden Tanner's failure to train made it obviously likely that someone would suffer substantial bodily harm. The District Court found that there are sufficient facts in the record from which a jury could conclude that no defendants did not take reasonable measures and no, excuse me, yes, the failure to train did make it obviously likely that someone would be injured. This court lacks jurisdiction to review for sufficiency. It can only review for materiality. And I think this court can affirm in a narrow opinion simply that this case turns on questions of fact that the court cannot reach. That's what I would ask the court to do. Judge Smith, I would just like to conclude. You asked what does the Constitution require many times and you asked what policy would I require of RCC if I were advising it. The question is not what policy does the Constitution require because we don't purport to have a private right of action to enforce a policy. The question is does the Constitution require reasonably safe conditions of confinement? And that answer is yes. And that's the constitutional right we seek to enforce, not some right to enforce the tool control policy. Thank you. All right. Thank you, Ms. Mills. Mr. Walters, you save time for rebuttal. Thank you, Your Honors. I'd like to address just a few points made by close counsel. First and most importantly is this factual statement about the timeline of the four years prior to this that they had gun guards in this area. Both Officer Pierce and Officer Ladner testified that gun guards were used when offenders back then were taken outside the prison gates and worked out in a field outside of everything and there was a four-post gun guard, meaning one on every corner, to make a perimeter. And if they stepped outside of that perimeter, there were certain issues that would go. That was not what they did inside the prison, inside the wind unit yard, which is completely different. In fact, Officer Pierce, the question was, yard duty then is something different than field duty. That was plaintiff's counsel's question. And Officer Pierce, very different, yes. And then they went on to explain, and that's ROA site 910 to 912 for Defendant Pierce and Defendant Ladner, ROA 1154 to 1158, where they explain the old way of taking people out in the yard. And actually, the question that brought up this discussion was just about why there is still a work duty label for every inmate, meaning he's on field crew 8 or field crew 9. And that was an explanation of why there is that label there, but that they don't do it anymore because they don't have enough officers to take them outside the prison gates. There's a completely different set of requirements and a completely different set of warnings and cautions outside the prison gates than there are inside the prison gates. So the discontinuous of the use of gun guards coincides with the discontinuous of the practice of taking inmates outside the gates. That's correct. That's correct. And so the seven years that we cited within the records, there's no bearing on the field crews that went outside that had gun guards with the practice that happened on the wind unit yard. That's been the same. All of the officers testified that that's been the same policy since they drafted the policy. And with respect to the policy and the training, Warden Tanner testified he drafted the policy in connection with multiple other folks from the prison to determine what was best practices. And Warden Tanner also testified that these policies and the way that they are implemented are audited every three years by the American Correctional Association and that they are in compliance every single year, or every single audit, with the ACA requirements in terms of the policy and the way it's implemented. So regardless of whether... When you say, and the way it's implemented, so you're saying somebody stands out there and watches how the guards are doing their job and then says that's in accordance with the policy? Warden Tanner testified that the ACA auditors would come in for approximately three days at a time during their audit. They would review all the policies themselves to make sure they are in compliance with the ACA standards for policies. And then they would actually go out and do personal observations, speak with officers to make sure that the implementation and the way it's being done is consistent with the policy itself. And so we go back to whether or not this is a highly predictable incident. And I would submit to you that seven prior years documented and no prior instances that any of these officers could remember does not suggest highly predictable. And when you go back to it, you go back to the circumstances surrounding it. Judge Smith, to your question about the constitutional minimum, I think it all depends upon the circumstances within which this implement is used. And in this instance... Well, Ms. Mills told us that the policy meets the constitutional minimum. I think she's conceded that in answer to my question because she said all they have to do is just follow the policy. I hear her as complaining that the policy was not being adequately followed or implemented. Well, it's our contention that the policy was being followed in the way that they were implementing the policy at this time, that they were doing it as it was supposed to be done. Well, but what do we do with the evidence that at least at the time of this particular incident, according to what we heard today, the person to whom the... the inmate to whom the implement had been checked out left it or dropped it or abandoned it or whatever and went in to watch TV, and nobody saw that, and then that it was picked up and used as a weapon by someone else, and nobody saw that? I mean, I think in the end, this can just be considered a one-time incident or an isolated incident that they do this policy every single day, twice a day. I counted approximately 4,000 instances in the seven years prior, and there's been one. There's been one instance. May I make one point about training or of my time out? Actually, your time has expired. Thank you, Mr. Walters. Your case and all of today's cases are under submission.